J-A10026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: THE ADOPTION OF L.G.L.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.L.F., BIOLOGICAL MOTHER | No. 1631 WDA 2015 |

Appeal from the Order Entered September 21, 2015
In the Court of Common Pleas of Bedford County
Orphans' Court at No(s): AD-1 for 2015

BEFORE: GANTMAN, P.J., BENDER, P.J.E. AND SHOGAN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED JUNE 27, 2016**

Appellant, J.L.F. (Mother), appeals from the September 21, 2015 order involuntarily terminating her parental rights to her son, L.G.L.S., born in January of 2011 (Child). We reverse and remand in accordance with the following decision.

On August 26, 2014, Child's paternal grandmother, C.P. (Grandmother), and her husband, P.E.P., II, Child's step-grandfather (Grandfather) (collectively, Paternal Grandparents), filed a petition in the Court of Common Pleas of Cambria County for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).[1] By consent order dated October 31, 2014, the trial court transferred

_____

[1] In addition, the record includes a petition to confirm consent to adoption with respect to Child's father, M.L.S., Jr. (Father), filed by Paternal Grandparents in Cambria County on August 26, 2014. The record does not
*(Footnote Continued Next Page)*

the matter to the Court of Common Pleas of Bedford County, the county where Paternal Grandparents and Child resided, and where a child custody complaint was pending, having been filed by Mother against Paternal Grandparents one month before the termination petition, on July 25, 2014. Trial Court Opinion, 9/21/15, at 1.

The custody petition and the termination petition were scheduled for hearing on February 18, 2015. At the beginning of the hearing, the court stated that it would receive evidence regarding the termination petition first. N.T., 2/18/15, at 6. The following witnesses testified: Grandmother; Grandfather; and Mother. The termination hearing was continued on June 19, 2015, during which Mother; S.M., Mother's fiancé; Grandmother; and Grandfather testified.[2]

On August 26, 2012, Child was placed in the legal and physical custody of the Cambria County Children and Youth Service (CYS) due to an incident described by Mother as follows:

> That was the night that [Father] said to me that he was going to kill himself and that we should kill ourselves and he proceeded to open up the bottle of antifreeze that we had on the porch. And poured a glass, a cup of it for me and brought it to me. And

*(Footnote Continued)* ———————

reveal whether the petition was granted. In any event, Father has not filed a notice of appeal, nor is he a party to this appeal.

[2] Notably, the court appointed a Guardian *ad litem* (GAL) by order dated April 30, 2015. As such, the GAL did not participate during the first day of the hearing. On the second day of the hearing, the GAL participated and cross-examined all of the witnesses except S.M.

gave it to me to drink and then he also drank some and the next thing I knew I was in ICU at Conemaugh Hospital.

N.T., 6/19/15, at 11-12. She testified that Child "was upstairs in his crib, in his room" during the incident. *Id.* at 12.

On October 20, 2012, Child was placed in the custody of Paternal Grandparents. N.T., 2/18/15, at 9. By permanency review order dated November 28, 2012, the court transferred legal and physical custody of Child from CYS to Paternal Grandparents, under the supervision of CYS. The order provided that visits between Child and his parents "shall be at the discretion of" Paternal Grandparents. Order, 11/28/12, at 3. Further, the order stated that Mother had been in "minimal compliance with the permanency plan, and that the only thing [she] has done is attend scheduled visits with [Child]. She has not established a stable home. She has not attended to her drug and alcohol issues." Order, 11/28/12, at 1.

Mother, who has a Bachelor's degree in business administration, and a Master's degree in elementary education, testified that her drug addiction began in 2003 with prescription pain medication following an appendectomy. N.T., 2/18/15, at 57, 64, 88. Mother testified that, in March of 2010, when she began her relationship with Father, she "was very vulnerable." *Id.* at 58. She testified that Father was an alcoholic, and, although she had "never been a drinker," she started to drink "because it was easier to drink with him than to not drink with him." *Id.* at 65. Mother explained that Father was physically abusive to her, resulting in her suffering broken bones, black

- 3 -

eyes, and a broken eye socket. *Id.* at 63. She testified, "[t]here were times when I would buy marijuana for him because it was easier to let him smoke marijuana than to have him drink, because when he drank he became more violent and aggressive than if he was smoking marijuana." *Id.* at 65.

After her suicide attempt, Mother remained with Father until June of 2013, when he was sentenced to 90 days imprisonment. *Id.* at 72. Mother testified that, on June 15, 2013, she "walked to Conemaugh Memorial Hospital and [ ] said, 'I need help.'" *Id.* at 73.

Mother immediately entered drug and alcohol treatment at the Meadows, where she remained for eleven weeks. *Id.* Thereafter, she was transported to White Deer Run for treatment, where she remained for seventeen days. Mother completed inpatient rehabilitation at Guadenzia Concept, where she was successfully discharged after 90 days. *Id.* at 74. Mother continued with intensive outpatient rehabilitation, and she testified that she still has "a very strong support group of women in [Narcotics Anonymous]." *Id.* at 76. By February 18, 2015, the first day of the termination hearing, Mother had been clean and sober for twenty months. *Id.* By June 19, 2015, the last day of the hearing, Mother had been clean and sober, without relapse, for more than two years. N.T., 6/19/15, at 33.

Mother testified that, since June of 2013, Father has made an unspecified number of attempts to contact her, but she has never responded to him or contacted him. N.T., 6/19/15, at 50. Mother currently resides in

the home of her fiancé in Laurel, Maryland, with whom she has a daughter who was nine months old at the time of the termination hearing. *Id.* at 36, 46, 52.

By order dated September 21, 2015, and entered on September 22, 2015, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). In addition, by separate order dated September 21, 2015, the court dismissed Mother's custody complaint. On October 15, 2015, Mother filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On November 10, 2015, in lieu of an opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court directed this Court to its memorandum opinion accompanying the termination order.[3]

On appeal, Mother presents the following question for our review:

I. Whether the [orphans'] court's termination of Mother's parental rights is unsupported by clear and convincing evidence and constitutes an abuse of discretion and an err[or] of law in light of the Grandparents' obstructive conduct[?]

Mother's brief at 6.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate

---

[3] In its memorandum opinion, the orphans' court noted that the GAL opposed the termination of Mother's parental rights. The court stated, "The [GAL] cites the strides made by [Mother] to improve her circumstances and supports a reestablishment of contact." Trial Court Opinion, 9/21/15, at 6.

courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court need only agree with any one subsection of Section 2511(a), along with Section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, Paternal Grandparents requested the involuntary termination of Mother's parental rights pursuant to Section 2511(a)(1), (2), and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1),(2), (b).

We have explained,

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006). In addition,

> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

> *In re Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 91 (Pa. 1998).

> > Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

> *Id*. at 92 (citation omitted).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008).

Parental duty is defined as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

With respect to Section 2511(b), the requisite analysis is as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and

emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, in its memorandum opinion accompanying the subject order, the orphans' court found, "at this point [Mother] is in recovery and could take up parental duties. [Mother's] work in recovery is both impressive and praiseworthy but does not change the fact that she has been so long out of the child's life he doesn't know her." Trial Court Opinion, 9/21/15, at 7.

The court concluded that Mother's conduct warranted termination under Section 2511(a)(1). Specifically, the court found, "Mother had no contact with the child after October of 2012 and made no meaningful attempt to reestablish contact until October of 2013. This is a period of approximately one year. Since the child has been removed from her care[,] she has not performed parental duties." Trial Court Opinion, 9/21/15, at 6. Similarly, the court found that, "from at least August of 2012[,] when she attempted suicide[,] through October of 2013[,] she was not in a position to

care for her child and did not provide that care." *Id.* at 7.  For the reasons that follow, we conclude the orphans' court abused its discretion.

Mother testified that, following Child's placement in foster care on August 26, 2012, until November 28, 2012, when the court transferred legal and physical custody to Paternal Grandparents, she was granted bi-weekly visits with Child at the CYS office.  N.T., 2/18/15, at 69.  The record evidence demonstrates that Mother attended every visit.  *Id.*; Order, 11/28/12, at 1.  Mother acknowledged, at that time, she was unable to appropriately care for Child.  N.T., 2/18/15, at 70.  As such, at the hearing she attended that resulted in Child being placed in the custody of Paternal Grandparents, Mother testified she "did not object.  …  I hugged both of them and thanked them.  And I'm still grateful that [Child is] in a place where he [is] being cared for." *Id.* at 69.

Less than two months later, in January of 2013, Child turned two years old, and Mother telephoned to wish him a happy birthday.  N.T., 2/18/15, at 21.  Grandmother testified that she placed Mother "on speaker phone so [Child] could hear her…." *Id.*  Mother testified that, in March of 2013, she e-mailed Grandmother as a follow-up to a telephone conversation.[4]  N.T., 6/19/15, at 18.  Mother's e-mail, dated March 3, 2013, was introduced as an

_____

[4] Mother testified that, between February and early March of 2013, she "sent two, possibly three at the most, voice mails or texts [to Grandmother]." N.T., 6/19/15, at 49.

- 11 -

exhibit during the hearing. She stated in the e-mail, in part, "Last time we talked I was trying to set something up for the weekend of the 9th/10th to visit with [Child]. … Please tell [Child] his mommy loves him and misses him. I would very much like to see him and spend a few hours with him…." Defendant's Exhibit A. Mother testified Grandmother did not respond. N.T., 6/19/15, at 23.

In June of 2013, when Father became incarcerated, Mother commenced inpatient rehabilitation for substance abuse, for which she was successfully discharged on October 13, 2013. N.T., 2/18/15, at 75. In August of 2013, while in treatment, Mother wrote a letter to Grandmother. Mother testified that her letter stated, "I was … in the program, … and that I was appreciative of the fact that they had [Child], that I did want to reconnect with my son. And that I hoped to be able to do that." *Id.* The record includes Grandmother's handwritten response, dated September 11, 2013, which was nearly six pages long. In her response, Grandmother stated, in part, that she and Grandfather intend to adopt Child, and that they "will give him a life that he deserves, that does not include you and [Father]." Defendant's Exhibit 1, at 2. In addition, she requested Mother "do not ever ask to see [Child]." *Id.* at 5.

On October 21, 2013, eight days after her discharge from inpatient rehabilitation, Mother testified that she pursued her parental rights by first telephoning her caseworker from Cambria County CYS. N.T., 2/18/15, at

76. Mother testified that she ultimately made four telephone calls to the caseworker, but she never received a response. *Id.* at 77. Mother testified that she then made two telephone calls to her caseworker's supervisor. *Id.* Mother explained, "it was over a month and a half or so that I escalated and escalated [in making contact with CYS], trying to find out what was going on, what steps do I need to take and just is there anything that I can do." *Id.* Mother did not receive a response from the CYS supervisor. *Id.* at 77-78. Mother testified she next contacted the regional CYS office, and, by January of 2014, she received a response. *Id.* at 78. As a result of this contact, Mother received the name and address of her court-appointed attorney in the dependency matter, who informed her that the "case had been closed…. So, I was back to ground zero." *Id.* at 78-79.

On February 3, 2014, Mother hired private counsel "to request visitation with" Child.[5] N.T., 2/18/15, at 79. The record includes a letter from Mother's counsel, dated April 1, 2014, requesting setting up a schedule to commence visitation between Mother and Child.[6] Defendant's Exhibit 2. Mother testified that counsel for Paternal Grandparents responded by letter

_____

[5] Mother's counsel was admitted to the bar of Maryland, but not Pennsylvania. Upon discharge from inpatient rehabilitation, Mother went to live with her mother in Laurel, Maryland. N.T., 2/18/15, at 56; N.T., 6/19/15, at 36.

[6] Mother testified that she paid counsel's retainer fee on February 3, 2014. She does not know why it took counsel until April 1, 2014, to mail the letter to Paternal Grandparents. N.T., 2/18/15, at 79.

in May of 2014, denying her request.  N.T., 6/19/15, 34.  As such, Mother retained private counsel in Pennsylvania to represent her.  *Id.* at 34*.*  On July 25, 2014, Mother filed a custody complaint in the Court of Common Pleas of Bedford County, wherein she requested shared physical and legal custody.  Trial Court Opinion, 9/21/15, at 1.  Paternal Grandparents then filed the subject termination petition on August 26, 2014, as described above.

The foregoing testimonial and documentary evidence demonstrates that Mother "act[ed] affirmatively with good faith interest and effort" to preserve her parental relationship with Child since his placement in August of 2012.  *In re B.,N.M.*, *supra*.  Rather than yielding to the obstacles in maintaining that relationship, that is, her drug and alcohol addiction, her abusive relationship with Father, and the refusal of Paternal Grandparents to allow visitation between her and Child, the evidence demonstrates that Mother exercised "reasonable firmness" to overcome them.  *Id.*  Indeed, Mother overcame her drug and alcohol addictions.  She ended her abusive relationship with Father.  She resisted the refusal of Paternal Grandparents and fought to maintain the parent-child relationship immediately upon her discharge from inpatient rehabilitation.  Therefore, we conclude that the orphans' court abused its discretion in terminating Mother's parental rights

pursuant to 2511(a)(1).[7]  Based on the requisite bifurcated analysis in termination of parental rights matters, we need not review the subject order with respect to Section 2511(b).  **See In re L.M.**, **supra**.  Accordingly, we reverse the order involuntarily terminating Mother's parental rights.  In light of this disposition, the order dismissing Mother's custody complaint is null and void.  We remand this matter for further proceedings.

Order reversed.  Case remanded for proceedings consistent with this decision.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2016

_____

[7] Because the record overwhelmingly supports the finding of the orphans' court that Mother is capable of assuming her parental duties, we discern no abuse of discretion by the court in failing to terminate her parental rights pursuant to Section 2511(a)(2).

- 15 -